*NOT FOR PUBLICATION*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| PRESTON WIMBUSH,<br><br>　　　　　　　　　　　Plaintiff,<br><br>　　v.<br><br>JASON SNYDER, CITY OF TRENTON POLICE DEPARTMENT, and CITY OF TRENTON,<br><br>　　　　　　　　　　　Defendants. | Civ. No 3:13-cv-04654 (FLW)(DEA)<br>OPINION |

**WOLFSON, U.S. DISTRICT JUDGE:**

This lawsuit arises out of actions taken by Defendants Jason Snyder ("Snyder"), the City of Trenton Police Department, and the City of Trenton (Trenton Police Department and the City of Trenton collectively referred to as "Trenton Police") (all three defendants collectively referred to as "Defendants") against Plaintiff Preston Wimbush ("Wimbush," or "Plaintiff") in the wake of a shooting outside the Candlelight Lounge ("the Candlelight," or "the Lounge") in Trenton, New Jersey. Wimbush, who was briefly charged with aggravated assault with a weapon before the charges were dismissed, asserts Section 1983 claims, as well as associated other state law claims, against Defendants. Presently before the Court are two motions for summary judgment, one filed by Snyder and the other filed by Trenton Police.

　　For the following reasons, I grant Defendants' motions on Plaintiff's Section 1983 claims and decline to exercise supplemental jurisdiction over Plaintiff's remaining, state-law claims.

　**I.　Background**

1

The following facts are undisputed unless otherwise indicated. At approximately 1:37 AM, Trenton Police responded to a report of an assault in progress at the Candlelight, located at 24 Passaic Street in Trenton. As the officers proceeded to the Candlelight, they were informed by the dispatcher that a male had possibly been shot in the parking lot of the Lounge. Snyder's Statement of Material Facts ("Snyder's Stmt. of Facts") ¶ 1; *see also* Incident/Investigative Report at 5.

Upon arriving at the Lounge, Officer Luis F. Nazarrio ("Officer Nazarrio") observed an individual identified as Anthony Jerome Threadgill ("Threadgill") standing in front of the Lounge, "visibly upset and crying." Snyder's Stmt. of Facts ¶ 2. As Officer Nazarrio approached, Threadgill told him that "they shot my boy and the shooter is still inside the bar." Snyder's Stmt. of Facts ¶ 3; *see also* Feb. 4, 2011 Incident/Investigation Report at 7.

At or approximately at the same time, Officers Michael Palinszar ("Officer Palinszar") and Officer Rogers[1] located and were attending to one injured Mark Ford ("Ford"), located in the parking lot of the west side of the building. Snyder's Stmt. of Facts ¶ 4. Shortly thereafter, emergency medical services arrived and began to render aid to Ford, who later died from his injuries. *Id.* ¶ 5.

Meanwhile, Officer Guido[2] entered the Candlelight and observed Corrections Officer John Jenkins ("Jenkins") place a weapon on the bar. Officer Guido immediately took possession of that weapon. *Id.* ¶ 6. As Officer Guido did so, Jenkins handed him his corrections badge and repeatedly stated, "[T]hey were trying to kill me." *Id.* ¶ 7. Officer Guido observed that Jenkins was bleeding from the head. Incident/Investigation Report at 26.

---

[1] Neither party specifies, and the record does not indicate, Officer Rogers' full name.

[2] Neither party specifies, and the record does not indicate, Officer Guido's full name.

Sometime thereafter, Snyder arrived on the scene and took over the investigation. *Id.* ¶ 8. Snyder had heard a broadcast go out over the Trenton Police radio, reporting a call received for shots fired at the Lounge and indicating that an armed corrections officer had been "jumped," after which the caller heard multiple gunshots. *Id.* ¶ 16. Mercer County Prosecutor's Office Detective R. McNally ("Detective McNally") and Lieutenant R. Pisciello ("Lieutenant Pisciello") followed to the scene. *Id.* ¶ 9. A number of witnesses were identified and transported to headquarters for questioning.[3] *Id.* ¶ 10.

After some preliminary investigation, Snyder approached a black Ford Expedition owned by Jenkins, which was located in the Candlelight's parking lot. *Id.* ¶ 18. Snyder observed part of a broken bottle on the driver's side floor of the vehicle and a clear liquid, possibly beer from the bottle, splattered throughout the interior of the vehicle, particularly in the front near the driver's side door. *Id.* ¶ 18. Snyder also observed a pool of blood on the pavement near the rear driver's side tire of the car, and several spent shell casings as well as other materials located on the pavement near the driver's side of the vehicle. *Id.* ¶ 19. Sometime thereafter, Snyder spoke with Eulogio Bradley ("Bradley"), the Candlelight's owner, who advised him that he had seen Jenkins enter the bar that night and became involved in a verbal confrontation with three individuals, identified as Threadgill, Ford, and Michael Gibbs. *Id.* ¶ 21; *see also* Bradley Statement at 2. After observing the confrontation, Bradley ordered Ford, Threadgill, and Gibbs to leave the Lounge. Snyder's Stmt. of Facts ¶ 22; *see also* Bradley Statement at 2. According to closed circuit

---

[3] During the course of the investigation, Seargent Sondez advised Officer Nazarrio that Wimbush, identified as "Suspect #2," was at Helene Fuld Hospital, receiving treatment for a gunshot wound to his right wrist, and that Officer Gogan was standing by with him. *Id.* ¶ 13. Officer Gogan advised Officer Nazarrio that it was believed that Wimbush was involved in the incident and was with Ford at the time of the shooting. *Id.* ¶ 14. Neither party specifies, and the record does not indicate, the full names of either Seargent Sondez or Officer Gogan.

surveillance footage, Ford, Threadgill, and Gibbs exited through the front door of the Lounge, but they remained in front of the bar, on the sidewalk near the parking lot.[4] Snyder's Stmt. of Facts ¶ 23; *see also* Bradley Statement at 2.

Jenkins advised Bradley that he was leaving, and Bradley advised him to wait until Ford, Threadgill, and Gibbs left the area in front of the bar; Bradley feared that a physical confrontation might ensue as a result of the verbal dispute that had occurred inside. Snyder's Stmt. of Facts ¶ 24; *see also* Bradley Statement at 2. Nonetheless, Jenkins chose to leave the bar, and Bradley followed him. Snyder's Stmt. of Facts ¶ 25; *see also* Bradley Statement at 2. Upon walking out of the bar, Jenkins saw Ford, Threadgill, and Gibbs, and approximately three other men, begin to confront him. Snyder's Stmt. of Facts ¶ 26; *see also* Bradley Statement at 2. According to Snyder, "[t]hose individuals circled around [Jenkins] and began pushing him, at which time he pulled out a handgun and advised the group . . . that he 'did not want to hurt anyone, but he was not going to let anyone hurt him either.'"[5] *Id.* ¶ 27.

At that point, Bradley observed Threadgill attempt to calm Jenkins down and put his arm around him; Jenkins and Threadgill then began to walk away from the other individuals and towards Jenkins' car in the parking lot. Snyder's Stmt. of Facts ¶ 28; *see also* Bradley Statement. According to Bradley's statement, Jenkins still had his gun out at that point, and was holding it down next to his right leg as he walked. Snyder's Stmt. of Facts ¶ 29; *see also* Bradley Statement.

---

[4] Sometime during the course of the investigation, Detective Charles Parrish ("Detective Parrish") of the Tactical Services Unit spoke to Snyder and advised him about the existence and relevant contents of closed circuit surveillance footage. *Id.* ¶ 33.

[5] Wimbush disputes this statement, stating that"[t]he record shows that . . . Bradley reported that he saw the acts and heard the words described. It does not show that they in fact occurred as . . . Bradley describes in the manner this paragraph attempts to set forth." Plaintiff's Response to Snyder's Statement of Material Facts ("Pl.'s Response to Snyder's Stmt. of Facts") ¶ 27.

at 2. Bradley states that when Jenkins and Threadgill reached Jenkins' vehicle, three individuals from the group came up behind Jenkins and one of them struck Jenkins in the head with a bottle, at which point the three individuals began to "pummel" Jenkins by punching him.[6] Snyder's Stmt. of Facts ¶ 30; *see also* Bradley Statement at 2. Bradley heard Jenkins scream, "They are trying to kill me, call the police," almost immediately after which he heard multiple gunshots and saw the individuals who had been attacking Jenkins run onto Passaic Street, towards Calhoun Street.[7] Snyder's Stmt. of Facts ¶ 31; *see also* Bradley Statement at 3.

Bradley identified the people arguing with Jenkins inside the bar as well as the individuals who attacked Jenkins outside of the bar later that night "through photographs,"[8] which was recorded in a formal typed statement at Trenton Police headquarters. *Id.* ¶ 32. Bradley identified Wimbush as one of the attackers at that time.[9] *Id.*

---

[6] Bradley states that he saw one of the individuals from the group pass an object to the individual identified as Michael Gibbs, after which point Bradley stated that Gibbs, Wimbush, and Ford "darted towards Jenkins'" vehicle. Snyder's Stmt. of Facts ¶ 38; *see also* Bradley Statement at 2.

Snyder later states that Jenkins was attacked "[a]s soon as [he] opened his driver's side door" and identifies the three attackers as Ford, Wimbush, and Gibbs. *Id.* ¶ 39. Wimbush disputes this statement insofar as it is unattributed to Bradley's version of the events. Pl.'s Response to Snyder's Stmt. of Facts ¶ 39 ("The conclusions stated in this paragraph are derived from . . . Bradley's conjecture, not from first-hand observation.").

[7] Snyder's statement of facts merely states that the individuals ran "toward Calhoun." The Court infers that Snyder is referring to Calhoun Street in Trenton, NJ.

[8] However, Snyder later states that Bradley specifically identified Wimbush through the recorded surveillance footage. *Id.* ¶ 36.

[9] Snyder recorded a formal statement from Bradley at approximately 5:15 AM the next morning, during which Bradley related much of what has been heretofore attributed as his statements. *Id.* ¶ 36. Snyder states that Bradley (1) "made it clear that Ford, Wimbush, and Gibbs were out to get . . . Jenkins that night, due to an unknown incident they were confronting him about that had happened on a previous occasion," (2) further indicated that Ford, Wimbush, and Gibbs "were not leaving until they got him" and (3) stated that Jenkins was unsuccessfully attempting to flee. Snyder's Stmt. of Facts ¶¶ 40–41; *see also* Bradley Statement. However, Plaintiff disputes

5

On February 4, 2011, at approximately 9:45 AM, Detectives Egan and Garrios conducted a formal recorded interview of Threadgill. *Id.* ¶ 43. In that interview, Threadgill recounted a version of the incident in question that "substantially differ[ed] from that . . . set forth by . . . Bradley." *Id.* ¶ 44. Later that day, at approximately 2:10 PM, a second interview of Threadgill was taken. *Id.* ¶ 45. In the second interview, Threadgill stated that there had been an incident between Ford and Jenkins inside the bar, in which Threadgill had intervened and tried to make peace. *Id.* ¶ 46. At that point, everyone went outside and Ford and Jenkins began arguing again, at which time Wimbush arrived at the bar. *See id.* ¶ 50. Threadgill goes on to state that Wimbush, Willie Powell, and Michael Porter, as well as Gibbs, then gathered around Jenkins, at which point Jenkins struck Wimbush with his gun and Wimbush fell to the ground. *Id.* ¶ 51. Threadgill was ultimately able to calm Jenkins down and walked him to his vehicle. *Id.* ¶ 49. As he was walking back towards the Lounge, Threadgill was passed by Ford and Wimbush, who were walking in the opposite direction toward Jenkins, "at which time they jumped on . . . Jenkins." *Id.* ¶ 50. Threadgill stated that as Ford and Wimbush were wrestling with Jenkins, "gunshots went off."[10] *Id.* ¶ 51.

---

these statements, arguing that "the contents of [these] paragraph[s] are editorializing a document which speaks for itself." Pl.'s Response to Snyder's Stmt. of Facts ¶¶ 40–41.

Regarding the corroboration of the events as described by Bradley, Snyder learned during the course of his investigation that the surveillance video did not capture the actual shooting but did capture part of the incident outside the Lounge where a group of individuals were surrounding and pushing another person. *Id.* ¶ 33. That video also captured the individual who had been pushed walk with another individual with his arm around him, from the front of the bar toward the parking lot, at which time two other individuals are seen walking in the same direction as Jenkins and Threadgill. *Id.* ¶ 34. Snyder "personally reviewed the video and saw what had previously been detailed by one of the other investigating officers." *Id.* ¶ 52.

[10] Snyder does not specifically characterize the statements describing the later events associated with this version of events as narrated by Threadgill; however, the Court infers the statements to be as such because, in Snyder's statement of material facts, the general narration of the later events immediately follows Threadgill's narration of the initial events in question. *See id.* ¶¶ 46–51. Indeed, Wimbush objects to paragraphs 50 and 51 of Snyder's statements of facts as being asserted as fact without attribution to Threadgill.

6

Ultimately, Trenton Police determined that Jenkins had shot two individuals: Ford, now deceased, and Wimbush, and that the shootings occurred during an attack in which Wimbush and Ford participated, against Jenkins.[11] Trenton Police's Statement of Material Facts ("Trenton Police's Stmt. of Facts") ¶ 4. Based upon the information discussed above, Mercer County Assistant Prosecutor Brian McCauley ("McCauley") found probable cause to charge Wimbush with aggravated assault and related weapons offenses. *Id.* ¶ 53; *see also* Peterson Affidavit of Probable Cause. Detective Scott Peterson then signed a warrant complaint against Wimbush, charging Wimbush with (1) aggravated assault, (2) possession of a weapon for unlawful purposes (glass beer bottle), and (3) unlawful possession of a weapon (glass beer bottle).[12] *Id.* ¶¶ 54, 55; *see also* Wimbush Charges. The grand jury returned indictments against Wimbush, and a criminal case commenced, in which Jenkins refused to testify against Wimbush on the understanding that the charges against Wimbush would be dismissed. Snyder's Stmt. of Facts ¶ 61–63; *see also* Wimbush Indictment; Jenkins Certif. ¶¶ 16, 17. Eventually, the Mercer County Prosecutor's Office dismissed the indictment against Wimbush. Trenton Police's Stmt. of Facts ¶ 7.

On February 13, 2013, Plaintiff filed a thirteen-count Complaint in the Superior Court of New Jersey against Defendants Jenkins, Candlelight, NJDOC, as well as Defendant Jason Snyder ("Snyder") and the City of Trenton Police Department and City of Trenton (together, "Trenton Police") (collectively, "Defendants"). In Counts One through Three, Plaintiff brought personal

---

[11] Plaintiff disputes this statement, arguing that "[t]he contents of this paragraph are editorializing a document that speaks for itself." Plaintiff's Response to Trenton Police's Statement of Material Facts ("Pl.'s Response to Trenton Police's Stmt. of Facts") ¶ 4.

[12] Detectives Edgar Rios and Peterson later served Wimbush with the warrant at Capital Health Systems Fuld Campus, where he was being treated for a gunshot wound to his right wrist. *Id.* ¶ 54. Wimbush was arrested on February 4, 2011. Trenton Police's Stmt. of Facts ¶ 5.

injury tort claims against Jenkins. In Counts Four and Five, Plaintiff brought negligent supervision and *respondeat superior* claims against NJDOC, arising out of Jenkin's alleged conduct. In Count Six, Plaintiff brought a negligent premises liability claim against the Candlelight. In Counts Seven through Nine, Plaintiff brought malicious prosecution, false imprisonment, and gross negligence claims against Snyder, as well as unnamed defendants, arising out of Plaintiff's arrest and criminal proceedings, as well as a conspiracy to prevent wrongdoing claim in Count Twelve. In Counts Ten and Eleven, Plaintiff brought negligent supervision and *respondeat superior* claims against Trenton Police. Lastly, in Count Thirteen, Plaintiff brought a claim for violation of his constitutional rights against all Defendants under 42 U.S.C. § 1983.

Trenton Police timely removed Plaintiff's Complaint to this Court on August 1, 2013 on the basis of original jurisdiction pursuant to 28 U.S.C. § 1331 over Plaintiff's Section 1983 claims. *See* Notice of Removal. Thereafter, defendants filed multiple motions to dismiss and for summary judgment. On April 22, 2014, this Court ruled on those motions and dismissed many of Plaintiff's claims, as well as multiple defendants. The only claims that remained were those in (1) Counts Seven and Eight in Plaintiff's Complaint, against Snyder; (2) Counts Ten and Eleven, against Trenton Police; and (3) Count Thirteen, against both Snyder and Trenton Police.

Thereafter, Snyder and Trenton Police filed separate motions for summary judgment.

### I.     Standard of Review

A moving party is entitled to judgment as a matter of law where there is no genuine issue as to any material fact. *See* Fed R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)); *Brooks v. Kyler,* 204 F.3d 102, 105 n. 5 (3d Cir. 2000) (citing F<small>ED</small> R. C<small>IV</small>. P. 56(c)). The burden of demonstrating the absence of a genuine issue of material fact falls on the moving party. *See Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 305 (3d Cir. 1999). Once the moving party has

satisfied this initial burden, the opposing party must identify "specific facts which demonstrate that there exists a genuine issue for trial." *Orson, Inc. v. Miramax Film Corp.*, 19 F.3d 1358, 1366 (3d Cir. 1996).

Not every issue of fact will be sufficient to defeat a motion for summary judgment; issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Further, the nonmoving party cannot rest upon mere allegations; he must present actual evidence that creates a genuine issue of material fact. *See* FED R. CIV. P. 56(e); *Anderson,* 477 U.S. at 249. In conducting a review of the facts, the non-moving party is entitled to all reasonable inferences and the record is construed in the light most favorable to that party. *See Pollock v. Am. Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir. 1986). Accordingly, it is not the court's role to make findings of fact, but to analyze the facts presented and determine if a reasonable jury could return a verdict for the nonmoving party. *See Brooks,* 204 F.3d at 105 n.5 (citing *Anderson,* 477 U.S. at 249).

**II.     Analysis**

The Court will first examine Plaintiff's federal claim under Section 1983 against Snyder and Trenton Police before proceeding to his state claims.

   *a.   Count Thirteen – Section 1983*

In Count Thirteen, Plaintiff asserts an unspecified claim under Section 1983. Specifically, Plaintiff states that he repeats the allegations contained in the First through Twelfth Counts of his Complaint and then "claim[s] damages for the injuries set forth above under . . . § 1983 for violation of his constitutional rights under color of law." Compl., Count Thirteen, ¶¶ 1, 2.

Section 1983 of Title 42 of the United States Code provides a cause of action for violation of constitutional rights by a person acting under color of state law. To recover under § 1983, a plaintiff

must prove two elements: (1) a person deprived him or caused him to be deprived of a right secured by the Constitution or laws of the United States, and (2) the deprivation was done under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988).

       *i.   Plaintiff's Section 1983 Claim against Snyder*

To begin, the Court must determine which constitutional right or rights Plaintiff accuses Snyder of violating. Plaintiff's Complaint is of little assistance; it merely states that Plaintiff claims damages under § 1983 for "violation of his constitutional rights under color of law." Compl., Count Thirteen, ¶ 2. However, viewing the Complaint and Plaintiff's briefing in the light most favorable to Plaintiff, the Court infers that Plaintiff's Section 1983 claims against Snyder are predicated upon malicious prosecution and false imprisonment. *See generally* Compl., Count Thirteen; Pl.'s Opp. Br. The Court will begin by analyzing Plaintiff's Section 1983 claim for malicious prosecution.

The Third Circuit has "identified several elements essential to a § 1983 malicious prosecution claim. At a minimum, a plaintiff must [demonstrate] (1) deprivation of liberty (or perhaps some other constitutional right) separate from substantive due process, (2) an absence of probable cause for initiation of the criminal proceedings, and (3) termination or reversal of criminal proceedings by reason of the plaintiff's innocence," *Backof v. New Jersey State Police*, 92 Fed. App'x 852, 856 (3d Cir. 2004) (citing *Albright v. Oliver*, 510 U.S. 266, 271 n.4 (1994); *Montgomery v. De Simone*, 159 F.3d 120, 124 (1998); *Heck v. Humphrey*, 512 U.S. at 484; *Smith*, 87 F.3d at 110) (internal quotation marks omitted).

Snyder argues that there is no evidence in the record to suggest that the charges brought against Wimbush were either (1) motivated by malice or (2) not supported by probable cause.

Plaintiff, for his part, argues that numerous factual disputes prelude summary judgment on his claim.[13] Specifically, Plaintiff points to evidence provided by Snyder indicating that (1) Jenkins would not speak to detectives without his attorney present, which, according to Plaintiff, shows that Snyder could not conclude that Jenkins, "the primary witness, was able to provide 'reasonably trustworthy information or circumstances'" that Plaintiff assaulted and wielded a weapon against him; (2) Snyder reported that Bradley could not "specifically name Plaintiff as the individual who allegedly hit . . . Jenkins with a beer bottle"; (3) the events described by eyewitness Bryant Council cast . . . Jenkins as an unhinged man with an ax to grind"; (4) while Threadgill stated that he saw Ford and Plaintiff "wrestling with . . . Jenkins, [and] then he heard gunshots," Threadgill admitted to "not being completely honest" with his interviewing officers regarding the events leading up to, and after, the shooting; and (5) Snyder was unable to ascertain from the video surveillance footage which individuals "were in fact present in the footage, and without question as unable to ascertain what unfolded thereafter," thus rendering the video surveillance footage evidence did not amount to "reasonably trustworthy information or circumstances" that Plaintiff assaulted and wielded a weapon against Jenkins.

In analyzing a Section 1983 claim for malicious prosecution, "a grand jury indictment or presentment constitutes *prima facie* evidence of probable cause to prosecute, but . . . this *prima facie* evidence may be rebutted by evidence that the presentment was procured by fraud, perjury or other corrupt means." *Camiolo v. State Farm Fire & Cas. Co.*, 334 F.3d 345, 363 (3d Cir. 2003) (quoting *Rose v. Bartle,* 871 F.2d 331, 353 (3d Cir. 1989)).

Here, it is undisputed that a grand jury returned an indictment against Plaintiff. Snyder's Stmt.

---

[13] The Court notes that Plaintiff does not attach any evidence apart from two copies of his Complaint in support of his opposition to Defendants' motions.

of Facts ¶ 61; *see also* Wimbush Indictment. Further, Plaintiff has nowhere alleged, let alone pointed to facts in the record, that that the indictment was procured by fraud, perjury, or any other corrupt means. Rather, Plaintiff merely seeks to contest whether the evidence contained in the incident and investigative report amounted to probable cause to charge him.[14] Therefore, Plaintiff has failed to rebut the presumption that Snyder's actions were based upon probable cause. Accordingly, Plaintiff's Section 1983 malicious prosecution claim against Snyder must fail.[15] *See, e.g.*, *King v. Deputy Atty. Gen. Del.*, No. 14-4227, 2015 WL 3622179, at *4 n.6 (3d Cir. June 11, 2015).

Regarding Plaintiff's Section 1983 claim for false imprisonment, a claim for false imprisonment derives from a claim for false arrest; thus where police lack probable cause to make an arrest, the arrestee may also maintain a Section 1983 claim for false imprisonment based on a detention pursuant to that arrest. *See Adams v. Selhorst*, 449 Fed. App'x 198, 201 (3d Cir.2011) (citing *Groman v. Twp. of Manalapan*, 47 F.3d 628, 636 (3d Cir. 1995)). A false imprisonment claim is also grounded in the Fourth Amendment's guarantee against unreasonable seizures. *Groman*, 47 F.3d at 636 (citations omitted).

---

[14] Plaintiff argues in his brief that "[t]he issue of probable cause is not confined to the statements and evidence that Defendant Snyder selectively filtered during his investigation to shield . . . Jenkins from criminal scrutiny. It also encompasses his very attitude towards the investigation, which was a deliberate or reckless refusal to recognize that the evidence contained overwhelming discrepancies, admitted issues with witness veracity, and, most importantly, the lack of any credible witnesses suggesting Plaintiff personally attacked . . . Jenkins with a weapon." Pl.'s Opp. Br. at 7. However, the only facts to which Plaintiff points, and which have been described *supra*, are insufficient to rebut the presumption of probable cause, because all of those facts were in or could have been inferred from the investigative report, and they do not suggest that the indictment against Plaintiff was obtained through fraud, perjury, or other corrupt means. *See Camiolo*, 334 F.3d at 363.

[15] Because Plaintiff has failed to rebut the presumption that Synder had probable cause, I need not reach whether Snyder has successfully asserted the defense of qualified immunity, which Snyder argues in the alternative.

Here, as stated *supra*, Plaintiff has failed to rebut the presumption that Snyder, to the extent he participated in Plaintiff's arrest and imprisonment, had probable cause to believe Plaintiff was guilty of the charges brought against him. Because the lack of probable cause is an essential element of a Section 1983 claim for false imprisonment, Plaintiff's claim must also fail.[16] *Groman*, 47 F.3d at 636 (restating that "an arrest based on probable cause could not become the source of a [§ 1983] claim for false imprisonment").

    ii.    *Plaintiff's Section 1983 against Trenton Police*

Regarding Plaintiff's Section 1983 claims against Trenton Police,[17] "[c]ourts 'treat a municipality and its police department as a single entity for purposes of section 1983 liability.'" *Mikhaeil v. Santos*, No. 2:10-CV-03876 WJM, 2012 WL 6554093, at *4 (D.N.J. Dec. 14, 2012) (quoting *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 25 n.4 (3d Cir. 1997)).

The Supreme Court has long held that there is no vicarious municipal liability in § 1983 cases. Rather, "[a] plaintiff seeking to impose liability on a municipality under § 1983 [must] identify a municipal policy or custom that caused the plaintiff's injury." *Kriss v. Fayette Cnty.*, 504 Fed. App'x. 182, 187 (3d Cir. 2012) (citing *Bd. of Cnty. Commis of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997)); *see also Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978). This liability is known as "*Monell* liability."

However, "[n]o *Monell* liability can attach to municipal defendants if no individual officials have violated a plaintiff's rights." *Kokinda v. Breiner*, 557 F. Supp. 2d 581, 591 (M.D. Pa. 2008) (citing *Williams v. Borough of West Chester,* 891 F.2d 458, 467 (3d Cir. 1989)). Therefore, because

---

[16] See *supra* note 15 explaining that the Court need not engage in a qualified immunity analysis.

[17] The Court has *supra* clarified that both defendants Trenton Police Department and the City of Trenton are collectively referred to as "Trenton Police."

Plaintiff has failed to create a genuine issue of material fact regarding whether Snyder's actions were not based upon probable cause, his Section 1983 claims against Trenton Police, construed as claims against the City of Trenton, that are predicated upon malicious prosecution and false imprisonment, must also fail.[18] *See, e.g.*, *Kokinda*, 557 F. Supp. 2d at 591.

Therefore, summary judgment is granted to Snyder and Trenton Police on Plaintiff's Section 1983 claims.

### b. *Plaintiff's State Law Claims*

Plaintiff's remaining claims are as follows: (1) in Count Seven, malicious prosecution, against Snyder; (2) in Count Eight, false imprisonment, against Snyder; (3) in Count Ten, negligent supervision, against Trenton Police; and (4) in Count Eleven, *respondeat superior*, against Trenton Police. All remaining claims arise under state law, and Defendants removed the action to this Court solely on the basis of federal question jurisdiction over Plaintiff's Section 1983 claims. *See* Notice of Removal.[19]

"It is a principle of first importance that the federal courts are tribunals of limited subject matter jurisdiction." 13 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, FEDERAL PRACTICE AND PROCEDURE § 3522. 28 U.S.C. § 1367(c) states in relevant part that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... (3) the district

---

[18] To the extent Plaintiff is asserting a Section 1983 claim for negligent supervision against Trenton Police, such a claim must fail because Plaintiff has failed to demonstrate a genuine issue of material fact regarding a constitutional violation, let alone the existence of a policy or custom that resulted in such a violation. *Trueman v. City of Upper Chichester*, 289 Fed. App'x 529, 539 (3d Cir. 2008) ("In order to succeed on this cause of action, Trueman had to prove the existence of a policy or custom that resulted in a constitutional violation.") (citing *Monell.*, 436 U.S.at 694–95 (1978)).

[19] No diversity jurisdiction exists; Plaintiff is a New Jersey resident and is suing New Jersey entities. *See* Complaint ¶ 1; 28 U.S.C. 1332.

court has dismissed all claims over which it has original jurisdiction." As the Supreme Court has stated in its seminal opinion on this issue, "[i]t has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. . . . Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). The Third Circuit has "recognized that, 'where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.'" *Hedges v. Masco*, 204 F.3d 109, 123 (3d Cir.2000) (emphasis added) (quoting *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir.1995)); *see also Burnsworth v. PC Lab.*, 364 Fed. App'x 772, 776 (3d Cir. 2010). Put another way, "[a]bsent extraordinary circumstances, 'jurisdiction over claims based on state law should be declined where the federal claims are no longer viable.'" *Kalick v. Nw. Airlines Corp.*, 372 Fed. App'x 317, 322 (3d Cir. 2010) (quoting *Shaffer v. Bd. of Sch. Dirs. of Albert Gallatin Area Sch. Dist.*, 730 F.2d 910, 912 (3d Cir. 1984)). Further, no authority in the circuit has required that a district court retain jurisdiction over state law claims where the Court has awarded summary judgment to the defendants on a plaintiff's federal claims. *Garges v. People's Light & Theatre Co.*, 529 Fed. App'x 156, 164 (3d Cir. 2013) *judgment entered*, No. 13–1160, 2013 WL 3455818 (3d Cir. June 28, 2013) *cert. denied*, ––– U.S. ––––, 134 S.Ct. 930 (2014).

Here, I find no extraordinary circumstances to warrant exercising supplemental jurisdiction over Plaintiff's remaining state law claims. Accordingly, I decline to exercise supplemental jurisdiction over those claims; as such, Counts Seven, Eight, Ten, and Eleven are remanded.[20]

### III.     Conclusion

For the following reasons, Defendants' motions for summary judgment are GRANTED as to Count Thirteen of Plaintiff's Complaint. The Court further declines to exercise supplemental jurisdiction over Counts Seven, Eight, Ten, and Eleven of the Complaint, and, accordingly, remands those counts.


Dated: August 17, 2015                                              /s/     Freda L. Wolfson
                                                                                  Freda L. Wolfson, U.S.D.J.

---

[20] While the Court makes no finding on the sufficiency of Plaintiff's state law claims, I note that upon the record provided, Plaintiff's claims appear to generally lack an evidentiary foundation and suffer from other legal deficiencies. For example, Plaintiff's claim in Count Eight against Snyder for false imprisonment does not appear to cross the "verbal threshold" requirement of the New Jersey Tort Claims Act. *See DelaCruz v. Borough of Hillsdale*, 183 N.J. 149, 164 (2005) ("[F]alse arrest/false imprisonment claims against municipalities and their public employees for pain and suffering must first vault the verbal threshold of the Tort Claims Act in order to be compensable."); *see also* N.J. STAT. ANN. § 59:9-2 ("No damages shall be awarded against a public entity or public employee for pain and suffering resulting from any injury; provided, however, that this limitation on the recovery of damages for pain and suffering shall not apply in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $3,600.00.").